IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| In Re<br>SHEILA REEVES,<br><br>Debtor. | Chapter 7<br><br>Case No. 05-3348-PHX-SSC |
|---|---|
| SHEILA REEVES,<br><br>Movant,<br>vs.<br>GLEN PARK APARTMENTS,<br><br>Respondent. | MEMORANDUM DECISION<br><br>(Opinion to Post) |

## **I.  Preliminary Statement**

Sheila Dianne Reeves, the Debtor herein, and Glen Park Apartments ("Glen Park'), her former landlord, have been involved in various disputes during the course of the Debtor's bankruptcy proceedings.[1]  Initially the Debtor filed a motion complaining that Glen Park had violated the automatic stay and sought damages pursuant to 11 U.S.C. §362(h).  Glen Park filed

---

**1.** The Debtor filed her bankruptcy proceedings on March 8, 2005.  Hence, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 is not applicable to the controversies between the parties.

1

a cross motion seeking vacatur of the stay, because of the Debtor's nonpayment of rent, to pursue its rights and remedies pursuant to Arizona law. After an evidentiary hearing, this Court vacated the stay, but also awarded the Debtor damages in the amount of $1,000 and other sanctions for Glen Park's willful violation of the stay.[2] However, the dispute between the parties entered a second phase when the Debtor moved out of the Glen Park apartment. The Debtor attempted to collect the damages awarded to her by the Court, but Glen Park refused, alleging that the Debtor had damaged the premises when she moved out. Glen Park believed that it had a new claim of setoff against the Debtor as a result of her subsequent actions moving out of the apartment. The Debtor filed a "notice of non-compliance" with the Court on September 19, 2005,[3] which the Court has construed as a Motion to hold Glen Park in civil contempt of court or to impose additional sanctions as a result of Glen Park's refusal to comply with this Court's Order for a willful violation of the stay. In turn, Glen Park filed a cross motion to offset the Debtor's award of damages against its separate claim under Arizona law for Debtor's damage to the premises.[4] The Court conducted various pretrial proceedings on the Motion and Cross Motion, which were complicated by Glen Park's failure to attend a Fed. Bankr. Rule 7016 Conference and its subsequent failure to produce a videotape of the Debtor's Glen Park apartment to the Court and the Debtor in a timely manner. Ultimately an evidentiary hearing was presented on the issues, and this Decision shall constitute the Court's findings of fact and conclusions of law pursuant to Fed. Bankr. Rule 7052. The Court has jurisdiction to enforce or interpret an order entered by it, which is the nature of the claim asserted by the Debtor. 28 U.S.C. §§1334 and 157. The Glen Park claim for damages caused by the Debtor upon her

---

**2.** The Court's findings of fact and conclusions of law on the various motions is set forth in its Memorandum Decision dated August 30, 2005. Docket Entry No. 46. An Order was entered incorporating the Decision on August 30, 2005. Docket Entry No. 47. Neither party appealed this Court's Decision and Order.

**3.** Docket Entry No. 50.

**4.** Docket Entry No. 55.

vacatur of the premises is a State law claim, but because Glen Park seeks to offset its damages against the amount owed to the Debtor, the Court has pendent jurisdiction over this State law claim. City of Chicago v. International College of Surgeons, 522 U.S. 156, 118 S.Ct. 523 (1997); Bahrampour v. Lampert, 356 F.3d 969 (9th Cir. 2004); Executive Software North America, Inc. v. U.S. Dist., 24 F.3d 1545 (9th Cir. 1994).

## II. Issues Presented

Although Glen Park, in its current cross motion, requests this Court conclude that the lease agreement with the Debtor is a post-petition contract and that any damages resulting from the Debtor's vacatur of the apartment be deemed post-petition and, hence, not discharged in the Debtor's bankruptcy proceedings, the Court has previously made certain findings of fact and conclusions of law that are now final which affect the current rights and remedies of the Debtor and Glen Park. First, in its August 30, 2005 Decision, the Court has already determined that the Debtor's post-petition lease agreement became property of the estate pursuant to 11 U.S.C. §541(a)(7) and that the Debtor was entitled to punitive damages in the amount of $1,000 for Glen Park's willful violation of the automatic stay. The Court's Order incorporating said Decision has become final. Second, because the Debtor is pro se and Glen Park was represented by counsel that is not fully familiar with bankruptcy issues, the Court has had to review the pleadings and the evidence presented by the parties and framed the issues accordingly. The issues to be resolved by the Court are as follows.

    A. Whether Glen Park has failed to comply with the Court's Order assessing punitive damages against it in favor of the Debtor.

    B. If Glen Park has failed to comply, whether the Debtor is entitled to finding of civil contempt or that further sanctions should be assessed against Glen Park.

    C. Whether Glen Park has a claim under Arizona law for damages to the premises as a result of the Debtor's vacatur of the apartment. What is the amount of said claim?

3

D. If Glen Park has a claim for damages, is Glen Park able to set off said claim against the punitive damage claim awarded to the Debtor?

E. Is Glen Park entitled to a claim for recoupment of its damages for the Debtor's vacatur of the apartment which may reduce the Debtor's claim for damages?

### III. Factual Discussion

After the Debtor filed her bankruptcy petition, she entered into a lease agreement with Glen Park on March 25, 2005. On September 2, 2005, the Debtor vacated the apartment. The Debtor conceded that when she moved out, certain items at the property were damaged or broken. For instance, she conceded that there were large nail holes in the walls (where she had previously hung pictures), that there was a broken toilet seat in the master bathroom,[5] and that a large automobile tire, a box spring, and boxes had been left in the living room. She believed that the carpeting and vinyl flooring were in reasonably good condition and did not need to be replaced. The Debtor also testified that a window frame, security door, and door stop at the front of the apartment were broken and that there were several doors missing from the apartment when she moved in. The Debtor conceded that she did not have any documentation or cognizable evidence that could be presented at the time of trial which supported her contention that the apartment was damaged when she moved in.[6] On cross examination, the Debtor agreed that since she broke the toilet seat, she should be responsible for its replacement. The Debtor also conceded that Glen Park had waived the payment of a security deposit when she entered into the

---

**5.** The Debtor testified that she was a large woman and had inadvertently broken the seat.

**6.** Both the Debtor and Glen Park had statements from individuals to support their respective positions. Exhibits 4 and B. However, the individuals making said statements did not appear in Court. The Court excluded the statements on the basis of hearsay. The Debtor also had a list of damages to the apartment which she stated was prepared around April 2005 and delivered to Glen Park, through her son on April 5, 2005. However, the Debtor had not previously produced the document prior to trial, so it was not marked or admitted at the time of trial. The Debtor also conceded that the list did not include the broken window frame or that certain doors were missing.

4

lease, that she had made no rental payments under the lease, and that she had agreed to pay the administrative fee required by Glen Park in the amount of $125.[7]

The Debtor's adult son also testified. He agreed with his mother's testimony with what they left at the apartment when they moved and what was broken when they moved in. He did state that he broke a nob on the door in the master bath. He also stated that one of the doors in the bathroom was gone the entire time that they lived there.

Ms. Tacker was called as Glen Park's witness. She is the wife of Glen Park's counsel. The Court determined that she should be allowed to testify although the Debtor expressed concern about her relationship to Glen Park's counsel. The Court agreed that she was not a disinterested third party witness, but since she was present at the premises, she could provide the Court with factual information as to the condition of the premises. The Court also noted that Ms. Tacker did not view the premises until five days after the Debtor had moved out. The Court concludes that Ms. Tacker's testimony as to the condition of the premises is more credible than that submitted by the Debtor and her adult son.[8]

On September 7, 2005, five days after the Debtor left, Ms. Tacker viewed the Debtor's apartment and testified as to her recollection of the condition of said apartment. She testified that a dirty tire was leaning against the wall in the living room. The carpet and walls were "extremely dirty." She believed that there were stains from grease or oil in the carpet. There was also a box on the floor in the living room. She stated that the security door had been damaged, but from the inside out, as if someone had kicked the door open. She noted that there

---

**7.** Exhibit 1.

**8.** She also videotaped the premises. However, the Court had required, at a Fed. Bankr. R. 7016 Conference, that counsel for Glen Park provide a compact disk, or similar disk format, to the Court and the Debtor at least a week prior to the evidentiary hearing. Counsel did not do that, so the Court and the Debtor were presented with the disk, for the first time, at the evidentiary hearing. Based upon counsel's failure to provide the disk as he agreed and as ordered by the Court, the Court excluded the disk at the time of the hearing. (Exhibit C was not admitted into evidence.) As noted, the Court did allow counsel's wife to testify at the hearing.

5

were items in the refrigerator that were rotten and smelled. The kitchen drawers were full of items or were missing and the stove was "extremely dirty." She testified that the kitchen doors were off their hinges. The vinyl floor in the kitchen was dirty and had been damaged as if someone had dragged heavy items across the floor. In the bedrooms, she testified that the walls were damaged by holes, that the carpet was stained, that in places, the carpet was pulled away from the wall, and that there was debris left behind. The bathrooms were also described as dirty. Although she viewed the apartment five days after the Debtor left, the apartment was not ransacked, the security door was still in place, and although the window frame was bent, she did not see any forced entry to the apartment. Thus, the Court concludes that no one entered and damaged the premises after the Debtor left. The witness best described the condition of the apartment as the "Debtor having left in a hurry."

Glen Park also called its new manager of the complex to testify.[9] Since she was hired as of November 4, 2005, she did not have firsthand knowledge of what had occurred. She was the custodian of Glen Park's records, however, so she was able to review those for purposes of the hearing. She had been to the property and noted that when an apartment is vacated, the locks are re-keyed. During the time period from September 2, 2005 through September 7, 2005, the Glen Park records reflected that the Debtor's apartment had not been broken into. She did state that the Debtor's apartment was subsequently refurbished and that a new tenant was now occupying it. She was able to confirm that the apartment required additional cleaning because of its condition at a cost of $200, that the carpeting and the vinyl flooring needed to be replaced, that certain closet doors were broken and that certain door knobs were missing which was an additional cost item of $967.33, and that an administrative fee of $125 was owing for a total of $1,292.33. The Court accepts this amount as a portion of the damages incurred. However, the Court has concerns that many of these items are repeated again on the back of the document sent

---

**9.** The manager who had previously testified before the Court in August 2005 was no longer at the complex.

6

to the Debtor, such as broken door knobs and broken or missing doors.[10] The individual who prepared the document listing the expenses incurred by Glen Park is no longer employed by Glen Park, and she was not present at the hearing to be available for cross examination. Moreover, the document which listed the damages was undated. Hence, the Court is left with the firm conviction that many of the items that were billed to the Debtor were billed twice or were not adequately explained, and that the list setting forth the damages was not prepared until September 7, 2005, or even later. However, the Debtor did concede that she left large nail holes in the wall, that she left a tire and other items, and that she broke a toilet seat. Therefore, the Court concludes that additional charges of $35 for the nail holes, $175 to remove the tire and other items, and $30 for the broken toilet seat were incurred by Glen Park for a total of $240. Thus, Glen Park incurred charges of $1,292.33 and $240 for a total of $1,532.33.

## IV. Legal Discussion

**A. Whether Glen Park failed to comply with the Court Order**.

It is clear from the evidence presented that Glen Park made no attempt to pay the Debtor any of the sanctions imposed against it pursuant to this Court's Order of August 30, 2005. The Court granted Glen Park relief from the stay and also directed the Debtor to remove herself from the apartment by no later than September 2, 2005. The Debtor had no desire to remain at the premises after suffering through a heat wave and a lack of air conditioning at the complex. The travails of the Debtor are outlined by the Court in some detail in its prior Decision. As a result of the Court's August 30 Decision, Glen Park received the benefit of having the Debtor immediately remove herself from the premises without further proceedings, such as eviction

---

**10.** Exhibit 1. Compare the items listed for repair at a cost of $967.33, with the items listed on the back of the statement at an additional cost of $1,860.33.

7

proceedings, in the appropriate State Court. There is no doubt that the Debtor removed herself from the premises "in a hurry," because she was attempting to comply with the Court's directive.[11] However, Glen Park made no tender to the Debtor of the sanction amount. Indeed it appears that Glen Park had no intention of paying any sanctions to the Debtor. Ultimately it was the Debtor who had to file her "Notice of Non-Compliance" with the Court, which the Court has characterized as a Motion to hold Glen Park in civil contempt or to assess further sanctions against it. At the hearing before this Court, Glen Park offered no explanation for its inaction; its failure to tender the sanction amount. Moreover, since Ms. Tacker did not view the premises until September 7, 2005, Glen Park did not know until that date that it had any claim for damages against the Debtor. The Court's August 30, 2005 Decision had provided the alternative remedy to Glen Park if the Debtor did not vacate in a timely manner, which included the ability of Glen Park to proceed in State Court with its eviction proceedings and to collect rent and attorneys' fees that might be due and owing under the rental agreement. However, and the Court wishes to emphasize this point, the Debtor did remove herself from the premises as directed. Thus, it appears to this Court that Glen Park willfully disobeyed this Court's Order for the period from September 3, 2005 through September 7, 2005. Moreover, Glen Park, once it discovered the damages to the apartment, took no action to excuse itself from compliance with this Court's Order or to notify the Court of its intention to offset its damages against the sanctions awarded to the Debtor until October 20 when it filed its Cross Motion with the Court. This was well after the Debtor filed her Notice of Non-Compliance with the Court on September 19, 2005.

**B. Whether Glen Park's failure to act warrants a finding of civil contempt or that additional sanctions should be imposed**.

The Court has described Glen Park's willful failure to comply with a Court Order. Glen

---

**11.** Perhaps the Debtor would have left the apartment in a better condition if she had had more time.

8

Park offered no explanation for its contumacious conduct. The Court concludes that this failure to act by Glen Park warrants an additional sanction to be imposed against it at the rate of $50 a day for the period from September 3, 2005, until October 20, 2005 when it finally notified the Court that it desired to assert a setoff for damages to the apartment. In re Hercules Enterprises, Inc., 387 F.3d 1024 (9th Cir. 2004); In re Rainbow Magazine, Inc., 77 F.3d 278 (9th Cir. 1996); In re Lehtinen, 332 B.R. 404 (9th Cir. BAP 2005); In re Deville, 280 B.R. 483 (9th Cir.BAP 2002) (Bankruptcy court, in exercise of its power to enter "necessary or appropriate" orders, has inherent authority to impose sanctions for pattern of bad faith conduct which transcends conduct addressed by particular rules or statutes.) That is 47 days at $50 a day for an additional sanction of $2,350. In addition, Glen Park is still responsible for the $1,000 sanction set forth in the August 30, 2005 Decision. Glen Park shall pay the sum of $3,350 to the Debtor within fourteen days of the date of this Decision, or this Court shall assess Glen Park a sanction of $100 per day for day 15 and for each day thereafter for the next 60 days thereafter. If the sanction is still unpaid at the end of the time period, the Debtor may request an additional hearing to determine what action this Court should take for Glen Park's ongoing failure to comply with Court orders.

**C. Whether Glen Park has a separate claim for damages as a result of the Debtor's vacatur of the apartment. If so, what is the amount of said claim?**

In 1973 Arizona adopted a modified version of the Uniform Residential Landlord and Tenant Act. Thomas v. Goudreault, 163 Ariz. 159 (App. 1989). The Arizona Residential Landlord and Tenant Act, A.R.S. §§ 33-1301 through 33-1381, governs all residential landlord and tenant rights and obligations in Arizona. ("ARLTA") Its principal purpose is to encourage the landlord and tenant to maintain and improve the quality of Arizona rental homes. A.R.S. § 33-1302; Van Buren Apartments v. Adams, 145 Ariz. 325 (App. 1984).

In adopting its version of the Uniform Residential Landlord and Tenant Act, Arizona enacted that Act's expression of intent concerning the administration of remedies: "The remedies provided by this chapter shall be so administered that the aggrieved party may recover

9

appropriate damages. The aggrieved party has a duty to mitigate damages." A.R.S. § 33-1305(A); <u>Thomas v. Goudreault</u>, 163 Ariz. 159, 165 (App. 1989). The Act provides that a tenant, a landlord, or another aggrieved party may recover "damages" or "actual damages" for violations of different sections of the Act. <u>Id</u>. Pursuant to A.R.S. § 33-1341, the tenant is obligated, among other things, to keep the premises clean and safe, dispose of rubbish and waste, and not deliberately or negligently destroy, deface, damage, impair, or remove any part of the premises.[12] The tenant is obligated to use reasonable care to cause no unnecessary injury to the leased premises while using them for the purpose for which they were leased. Simply, the tenant is to surrender the leased premises in the same state and condition as when received, with the exception of usual wear and tear. Pursuant to A.R.S. § 33-1369, a tenant's noncompliance with Section 33-1341 may result in the landlord repairing or replacing the damaged items and then

---

**12.** A.R.S. § 33-1341 (West 2005) provides:

The tenant shall:

1. Comply with all obligations primarily imposed upon tenants by applicable provisions of building codes materially affecting health and safety.

2. Keep that part of the premises that he occupies and uses as clean and safe as the condition of the premises permit.

3. Dispose from his dwelling unit all ashes, rubbish, garbage and other waste in a clean and safe manner.

4. Keep all plumbing fixtures in the dwelling unit or used by the tenant as clean as their condition permits.

5. Use in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air-conditioning and other facilities and appliances including elevators in the premises.

6. Not deliberately or negligently destroy, deface, damage, impair or remove any part of the premises or knowingly permit any person to do so.

7. Conduct himself and require other persons on the premises with his consent to conduct themselves in a manner that will not disturb his neighbors' peaceful enjoyment of the premises.

10

itemizing the repairs at actual and reasonable cost or the fair and reasonable value thereof as rent, or if the leasehold has terminated, for immediate payment.[13] As noted above, the Court found that Glen Park had incurred damages of $1,532.33 as a result of the Debtor's failure to leave the premises in an acceptable condition. Therefore, based on Arizona law, the Court finds that Glen Park does have a separate claim for damages as a result of the Debtor's vacatur of the apartment.

**D. If Glen Park has a claim for damages, is Glen Park able to set off said claim against the punitive damage claim awarded to the Debtor?**

"The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.' " Newbery v. Firemen's Fund Ins. Co., 95 F.3d 1392, 1399 (9th Cir. 1996) *citing* Citizens Bank of Maryland v. Strumpf, 116 S.Ct. 286, 289 (1995). Although no federal right of setoff is created by the Bankruptcy Code, the Code does provide that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy. Citizens Bank of Maryland v. Strumpf, 116 S.Ct. 286 (1995). The setoff concept in bankruptcy cases is governed by 11 U.S.C. § 553. Under section 553(a), each debt or claim sought to be offset must have arisen prior to filing of the bankruptcy petition. Under the Bankruptcy Code setoff provision, for mutual debts to cancel each other, the debts may arise either from separate transactions or a

---

**13.** A.R.S. § 33-1369 (West 2005) provides:

If there is noncompliance by the tenant with § 33-1341 materially affecting health and safety that can be remedied by repair, replacement of a damaged item or cleaning and the tenant fails to comply as promptly as conditions require in case of emergency or within fourteen days after written notice by the landlord specifying the breach and requesting that the tenant remedy it within that period of time, the landlord may enter the dwelling unit and cause the work to be done in a workmanlike manner and submit an itemized bill for the actual and reasonable cost or the fair and reasonable value thereof as rent on the next date when periodic rent is due, or if the rental agreement has terminated, for immediate payment.

11

single transaction, but must be incurred prepetition. In re TLC Hospitals, Inc., 224 F.3d 1008 (9th Cir. 2000); In re Buckenmaier, 127 B.R. 233 (9th Cir. BAP 1991). Setoff is allowed only in very narrow circumstances in bankruptcy, whereas a creditor may successfully raise recoupment as a defense where setoff is not permitted. In re Gosnell Development Corp. of Arizona, 221 B.R. 776 (Bankr.D.Ariz.1998). Moreover, the decision to award setoff rests squarely within discretion of Bankruptcy court. In re Hal, Inc., 122 F.3d 851 (9thCir. 1997).

In this case, setoff is not appropriate. The claims of both parties; that is, the damage claim by Glen Park and the punitive damage claim awarded to the Debtor, were incurred post-petition. Glen Park's damage claim did not come about until after the Debtor had vacated the premises. The punitive damage claim was awarded to the Debtor after this Court held numerous hearings, and held the Debtor was entitled to punitive damages for Glen Park's willful violation of the stay. Therefore, Glen Park is not entitled to offset its damage claim against the amount owed to the Debtor.

**E. Is Glen Park entitled to a claim for recoupment of its damages for the Debtor's vacatur of the apartment which may reduce the Debtor's claim for damages?**

The doctrine of recoupment "is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." Newbery v. Firemen's Fund Ins. Co., 95 F.3d 1392, 1399 (9th Cir. 1996). Unlike setoff, recoupment is not limited to prepetition claims and, thus, may be employed to recover across the petition date. In re TLC Hospitals, Inc., 224 F.3d 1008 (9th Cir. 2000). Recoupment is not specifically provided for in the Bankruptcy Code. However, it is an equitable remedy considered by the Bankruptcy Courts that allows a debt to be offset against a claim, irrespective of whether the debt was created pre-petition, and the claim, post-petition, and irrespective of whether the automatic stay would normally preclude the offset. In re TLC Hospitals, Inc., 224 F.3d 1008 (9th Cir. 2000). An obligation is satisfied by crediting it against a reciprocal obligation arising from the same transaction. In re Women's Technical Institute, Inc.,

12

200 B.R. 77, 80 (Bankr. D.Mass. 1996). Also *see* In re Madigan, 270 B.R. 749, 754 (9th Cir. BAP 2001) (Claim must arise from the same transaction to be recouped against another claim.)

The Ninth Circuit determined a number of important issues in the case of In re Newbery Corporation (Newbery Corp. v. Fireman's Fund Inc. Co.), 95 F.3d 1392 (9th Cir. 1996). Newbery, as a large electrical contractor, obtained performance and payment bonds, for the jobs or project on which it worked. Fireman's Fund was the surety on the bonds, guaranteeing that projects would be completed and vendors, suppliers, and employees paid, if Newbery could not complete the project on which it started. United Bank of Arizona initially provided the funding, secured by various assets of Newbery, for Newbery's business operations. An indemnity agreement provided that Newbery would indemnify Fireman's Fund, if the latter were forced to step in and complete Newbery's projects at a loss.

Newbery abandoned its projects and filed a Chapter 11 petition. Citibank (Arizona) had acquired United Bank by the time of the filing. Therefore, Citibank, Newbery and Fireman's entered into a postpetition agreement to complete the projects. Newbery transferred its interest in the bonded projects to Fireman's, Fireman's agreed to use Newbery's equipment to finish the projects, and Fireman's agreed to pay the rent for the equipment to Citibank, Newbery's secured lender. As a result of the settlement of the postpetition lawsuit brought by Newbery against Citibank, the parties set up certain pooled assets upon which Citibank would have a nonrecourse perfected security interest, Citibank agreed to provide new financing to Newbery, Citibank agreed to release its security interest in all other assets of Newbery, and through an agreement effectuated by a subsequent assignment, Citibank transferred to Newbery its right to receive the rental payments on the Newbery equipment from Fireman's. Id. at 1396-1397.

In subsequent proceedings in the District Court, Newbery commenced an action against, inter alia, Fireman's for the rental payments on the equipment. Fireman's interposed defenses of recoupment or setoff. Although the exact nature of the defenses is not specified or quantified in the Ninth Circuit decision, the District Court did grant summary judgment to Fireman's in its

13

recoupment defense. Id. at 1397. Not all issues were determined in such pretrial motions. The issue of the amount of rent to be paid for the equipment on the various projects was still not determined. Once the rental payments on one of the projects were determined, as a type of test case, the District Court then concluded that Newbery and Citibank, which had joined in the proceedings since the rental payments were included in the pooled assets upon which Citibank still had a nonrecourse perfected security interest, would receive nothing as a result of Fireman's defenses. Id. at 1397-1398.

Newbery agreed to indemnify Fireman's against all losses which Fireman's might sustain on the performance and payment bonds. Fireman's only asserted its recoupment claims as a defense. The amount recouped as a result of the defense is not specified other than to note that Newbery's affirmative claim of $17,455 on one project was eliminated.

The Ninth Circuit, in Newbery, concluded that recoupment is an equitable doctrine that does not conflict with the ratable distribution of assets amongst creditors as provided under the Bankruptcy Code (it is simply a defense on a claim and permits a determination of a "just and proper liability" on the main issue); that it is available in a number of cases, not just in the factual scenario where a party seeking recoupment has overpaid; and that it pertains to claims which arise out of the same transaction, if there is a "logical relationship" between them.

Based upon the case law, Glen Park is entitled to have their Motion to Offset Against Order for Damages granted. The damage claim for the Debtor's vacatur of the apartment arises out of the same lease agreement creating the obligations between the Debtor and Glen Park. The damages and sanctions assessed by the Court against Glen Park were also predicated upon the relationship created by the lease agreement. Equity demands that Glen Park be entitled to recoup their losses for damage caused by the Debtor upon vacatur of the premises.

14

## V. Conclusion

Based upon the foregoing, the Court concludes that Glen Park did fail to comply with the Court's initial August 30, 2005 Order. Glen Park's failure warrants a finding of civil contempt, which Glen Park may purge by prompt payment of $3,350 to the Debtor within fourteen days of this Decision, or the Court shall assess Glen Park a sanction of $100 per day for day 15 and each day thereafter for the next 60 days from the date of this Decision. Glen Park does have a claim for the damages incurred as a result of the Debtor's vacatur of the apartment. Said claim shall be in the amount of $1,523.33, which Glen Park may recoup by reducing the amount of the Debtor's sanctions. ($3,350 - $1,523.33 = the net amount of $1,826.67 due to the Debtor if paid within 14 days of this Decision.) If Glen Park does not pay the Debtor in a timely manner, Glen Park shall be assessed an additional sanction of $100 per day as outlined in this Decision. If Glen Park has not paid the Debtor within 60 days of the date of this Decision, the Debtor may request a further hearing to determine what action should be taken against Glen Park.

DATED this 30th day of March, 2006.

*/s/ Sarah Sharer Curley*

Honorable Sarah Sharer Curley
U. S. Bankruptcy Judge

BNC to Notice